UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICKY KAMDEM-OUAFFO,

                                         Plaintiff,

            v.

PEPSICO, INC., DR. PETER S. GIVEN, JR.,
DR. NAIJIE ZHANG, JOHN DOE, and/or
JANE DOE,

                                         Defendants.

Case No. 14-CV-227 (KMK)

OPINION & ORDER

Appearances:

Ricky Kamdem-Ouaffo
New Brunswick, NJ
*Pro se Plaintiff*

Robert Lawrence Maier
Jennifer Cozeolino Tempesta
Richard Benjamin Harper
Baker Botts LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Pro se Plaintiff Ricky Kamdem-Ouaffo ("Plaintiff") filed this Action in January 2013

against Defendants Pepsico, Inc. ("PepsiCo"), Dr. Peter S. Given, Jr. ("Dr. Given"), Dr. Naijie

Zhang ("Dr. Zhang"), John Doe, and/or Jane Doe in January 2013.  (Dkt. No. 1).  Plaintiff

alleges several causes of action arising out of his employment at PepsiCo, arguing principally

that PepsiCo employees fraudulently commandeered his intellectual property.  Before the Court

is Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  For the foregoing

reasons, Defendants' Motion is granted, and Plaintiff's First Amended Complaint is dismissed.

## I.  BACKGROUND

A.  <u>Factual Background</u>[1]

Plaintiff, a resident of New Brunswick, New Jersey, has "professional experience" in the "research and development, manufacturing, analysis[,] and application of flavors and aromas," as well as "flavor encapsulation[] and the use applications of edible film formers."  (Pl.'s Mem. of Law in Supp. of Pl.'s Countercl. and in Supp. of Denial of Defs.' Mot. To Dismiss ("Pl.'s Opp'n") Ex. 1 ("SAC") ¶¶ 1, 3–4 (Dkt. No. 43) (Plaintiff's proposed Second Amended Complaint).)  From July 14, 2008 to September 28, 2009, Plaintiff worked as a "Food Scientist contractor at PepsiCo's Research and Development facility in Valhalla, New York."  (*Id.* ¶ 22.)  In that capacity, Plaintiff was tasked with "provid[ing] leadership and strategy for developing [and] evaluating commercially viable Aroma Technology Delivery System[s] applicable to PepsiCo's commercial items."  (*Id.* ¶ 27.)

Prior to starting with PepsiCo, Plaintiff was required to sign a "Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property" ("Agreement") "with Pepsico through Subex Technologies, Inc." ("Subex"), the "contract [s]taffing [a]gency."  (*Id.* ¶ 23.)  Plaintiff signed the Agreement on July 8, 2008, at which time a Subex manager "explained to . . . Plaintiff . . . that the [A]greement . . . meant that . . . Plaintiff in principle consented to assigning his future intellectual property to PepsiCo for commercial use in

---

[1] The factual allegations that follow are derived from Plaintiff's proposed Second Amended Complaint (Dkt. No. 43), as discussed below.  While the Court will sometimes refer to Plaintiff's contentions as "alleged," the Court treats them as true for purposes of the instant Motion.

This section omits facts and allegations that pertain to ScentSational Technologies LLC, Steven M. Landau, and/or their pending lawsuit against PepsiCo, *see Scentsational Techs., LLC*, No. 13-CV-8645 (S.D.N.Y. filed Dec. 5, 2013), because Plaintiff's request that they be joined as necessary parties notwithstanding, (*see, e.g.,* SAC ¶ 123), neither has been joined as a party in this Action as of the date of this Opinion.

exchange for payment to be made to . . . Plaintiff during the course of the contract." (*Id.* ¶¶ 23–24.) At the same time, Plaintiff alleges that there was a "common understanding" that if Plaintiff created intellectual property during the period of his contract that was patentable, "PepsiCo would . . . credit . . . Plaintiff" as the inventor. (*Id.* ¶ 25.)

During the period of Plaintiff's employment, Plaintiff "pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques . . . that none of [PepsiCo's] employees [had] been able to do prior to Plaintiff's work." (*Id.* ¶ 29.) Plaintiff also "filled up five to seven [l]aboratory [n]otebooks," and created "scientific reports and . . . computer data" pertaining to his inventions. (*Id.* ¶ 85.) Plaintiff received $82,142 in compensation for his work, or $56,384 in take-home pay, which amounted to only a percentage of the $133,007.50 Plaintiff alleges he is owed under an unsigned purchase order ("Purchase Order"). (*Id.* ¶¶ 52–53, 186–87.)[2]

At some point prior to or on September 16, 2009, Defendants, at the direction of PepsiCo senior managers, "removed . . . Plaintiff's name from" intellectual property Plaintiff created during his period of employment at PepsiCo. (*Id.* ¶¶ 32, 34.) In subsequent patent applications, PepsiCo credited the inventions to Dr. Given and Dr. Zhang, despite the fact that they allegedly did not "contribute to the creation" of that property. (*Id.* ¶ 32.) Plaintiff alleges that Dr. Zhang was not an employee of PepsiCo when Plaintiff "created and conceptualized his

---

[2] Plaintiff alleges that he received only 42.39% of the amount he alleges he is owed under the Purchase Order, but by the Court's calculation, Plaintiff received 61.76%, as Plaintiff does not allege that the Purchase Order indicated that Plaintiff was to receive $133,007.50 *after* taxes. (SAC ¶ 53.) Nonetheless, Plaintiff alleges that he is the owner of the remaining percentage of his intellectual property. (*Id.*)

inventions and reduced them to practice," and that Dr. Given provided "no intellectual input or supervision" during that time.  (*Id.* ¶ 33.)

Plaintiff further alleges that the removal of his name from his inventions was part of a coordinated attempt by PepsiCo to distance itself from Plaintiff.  On the same day that PepsiCo managers removed Plaintiff's name, Dr. Given allegedly sent an email to his colleagues which said: "'Another hitch – [Plaintiff's] contract is terminating Oct. 5, and he'll be informed this week . . . more drama!  Please do not distribute this info, but [it] may impact our decision on inventorship.'"  (*Id.* ¶ 8 (second alteration in original) (italics omitted).)[3]  Dr. Zhang allegedly sent a similar email, stating that "'Ricky Kamdem is not [the] inventor.  He is just involved in the project . . . .'"  (*Id.* ¶ 9 (second alteration in original) (italics omitted).)  PepsiCo's Vice President of Research and Development, Valerie Jacklin, allegedly wrote to Dr. Given and the Director of the Ingredient Technology group, echoing Dr. Zhang's sentiment when noting that she was "'[n]ot [s]ure [they] [w]ant [Plaintiff] [o]n [t]he [i]nvention [l]ist.'"  (*Id.* ¶ 255 (italics omitted).)  An unnamed PepsiCo employee also allegedly entered a notation in Plaintiff's personnel file reading "Dept. not satisfied," suggesting Plaintiff's work was unsatisfactory.  (*Id.* ¶ 38 (italics omitted).)

On or around September 23, 2009, five days before the expiration of Plaintiff's contract, Plaintiff alleges that he was told by an unnamed human resources manager that he was "'culturally unfit'" for employment because he was "a black male [with] an opinion on scientific matters that was contrary to that of his peers of [another] skin color," and that he "needed to be

---

[3] As outlined below, Plaintiff's contract was scheduled to terminate on September 28, rather than on October 5.  (*See id.* ¶¶ 35–36.)

coached." (*Id.* ¶ 64–66.)[4]  Plaintiff likewise alleges that PepsiCo's decision not to credit Plaintiff

for his alleged inventions stemmed from "stereotypes and racial clichés about . . . Plaintiff as a

person of . . . black skin." (*Id.* ¶ 257.)  A few months later, on December 18, 2009, Plaintiff

alleges that Defendants wrote in a "Statement of Position" made to a United States government

agency that "Plaintiff was not able to do work, and was not creative . . . by comparison to [his]

counter parts [sic] of . . . other . . . race[s]." (*Id.* ¶¶ 67, 257.)  Plaintiff claims that Defendants

"represent[ed] that . . . Plaintiff went to work only to look for opportunities for predatory sexual

intercourse activity on women." (*Id.* ¶ 258; *see also id.* ¶ 68.)

On September 28, 2009, Plaintiff's employment contract ended and was not renewed.

(*Id.* ¶¶ 35–36.)[5]  At the expiration of his contract, Plaintiff sent a letter to PepsiCo management

in which he made an "'authorship claim on any current or future work resulting in . . . flavor

encapsulates or . . . aroma delivery systems because [he] single-handedly demonstrated the need

for [them] when no one at PepsiCo had [them] in mind . . . .'" (*Id.* ¶ 62 (first and second

alterations in original) (italics omitted).)  Thereafter, PepsiCo filed for five patents with the

United States Patent and Trademark Office ("USPTO") based on the intellectual property at

issue, one of which, a patent application for "Releasable Entrapment of Aroma Using Polymeric

Matrix," was granted on July 2, 2013 (US Patent No. 8,474,637 B2).  (*See id.* ¶¶ 41, 47, 60.)[6]  In

---

[4] Plaintiff does not specify whether the human resources manager was employed by PepsiCo or Subex.

[5] Plaintiff alleges that his contract was allowed to expire "for no reason other than to seize the Plaintiff's intellectual property."  (SAC ¶ 116.)  However, as outlined above, Plaintiff suggests that there may have been a race-based motive, and Plaintiff also implies in his Affidavit that his contract was allowed to expire because of his criticism of the use of "formaldehyde aroma capsules."  (Pl.'s Aff. ¶¶ 63–68, 71 (Dkt. No. 42).)

[6] The other patent applications are as follows: one for "Releasably Encapsulated Aroma" (US Patent App. No. US 13/56,551 A1), one for "Complex Coacervates and Aqueous Dispersion

connection with the patent applications, Dr. Given and Dr. Zhang allegedly each signed or cosigned "Inventor's Oath[s] or Declaration[s]," including a "Joint Inventor's Declaration," for the granted patent.  (*Id.* ¶¶ 44–48.)  Dr. Given and Dr. Zhang each also allegedly executed and filed an assignment of the relevant intellectual property to PepsiCo.  (*Id.* ¶¶ 49–50.)

On October 11, 2012, Plaintiff submitted a request to PepsiCo, asking that it amend the patent applications at issue "from which [it] . . . expunged . . . Plaintiff's name" to include his name.  (*Id.* ¶ 55.)  PepsiCo did not reply to this request, nor did it make the desired amendment.  (*Id.* ¶ 59.)[7]  Nonetheless, Plaintiff alleges that he is the "true inventor" of both the patented property and the property described in the four pending patent applications.  (*Id.* ¶¶ 60, 91, 106.)

B.  Procedural History

Plaintiff filed the instant Action on January 31, 2014.  (Dkt. No. 1.)  On March 14, 2014, the same day that Defendants first requested a pre-motion conference, (Dkt. No. 8), Plaintiff filed his First Amended Complaint, alleging thirteen causes of action, namely "breach of intellectual property agreement," "wrongful appropriation of plaintiff's intellectual property," "fraudulent obtaining of signature," "correction of inventorship," "unjust enrichment," "the necessity of constructive trusts," a "request for subpoenas," three causes of action relating to alleged false statements made to the USPTO, and three causes of actions relating to other alleged criminal conduct.  (*See* Dkt. No. 9.)  On March 26, 2014, Defendants filed two letters requesting a pre-motion conference.  (Dkt Nos. 19, 20.)  The Court granted Defendants' request, (Dkt. No. 21),

_____

of Complex Coacervates and Methods of [M]aking Same" (US Patent App. No. 13/272,270), and two for "Coacervates Complex, Methods [a]nd Food [P]roducts" (US Patent App. Nos. 13/175,508 and 13/175,451).  (SAC ¶¶ 48, 60.)

[7] Plaintiff alleges that he also contacted the Westchester County District Attorney and the FBI about this matter.  (*See* Pl.'s Aff. ¶¶ 95–98.)

and at the pre-motion conference held on May 15, 2014, the Court set a briefing schedule for

Defendants' Motion to Dismiss, (*see* Dkt. (minute entry for May 15, 2014)).  Defendants filed

their Motion To Dismiss and Memorandum of Law on June 6, 2014, (Dkt. Nos. 34, 35), and an

associated Declaration on June 9, 2014, (Dkt. No. 37).  On July 9, 2014, Plaintiff submitted a

"Notice of Counterclaim . . . in Support of the Denial of the Defendants' Motion to Dismiss,"

and an Affidavit and Memorandum of Law in support of that submission.  (Dkt. Nos. 41, 42,

43.)[8]  Plaintiff also filed a "Proposed Order [G]ranting . . . Plaintiff's Counterclaim" on July 10,

2014.  (Dkt. No. 44.)  Defendants filed their Reply on August 8, 2014.  (Dkt. No. 46.)

Plaintiff has also filed a number of letters and requests, particularly during the two-month

period preceding the pre-motion conference on Defendants' Motion To Dismiss.  On March 18,

2014, Plaintiff filed a letter in response to Defendants' requests for a pre-motion conference,

contesting Defendants' claims and requesting that the Court "allow the [j]udicial process to

continue its normal course to the next step of discovery."  (Dkt. No. 14 at 10).  On March 21,

2014, Plaintiff filed a letter identifying alleged inaccuracies on the docket.  (*See* Dkt. No. 16.)

On March 24, 2014, Plaintiff filed a letter requesting permission to join ScentSational

Technologies LLC and Steven M. Landau as co-defendants.  (*See* Dkt. No. 18.)  On March 27,

2014, Plaintiff filed a "Supplemental Answer" to Defendants' requests for a pre-motion

conference, making similar arguments to those in his March 18 letter, (*see* Dkt. No. 22), and to

which Defendants replied on April 3, 2014, (Dkt. No. 25).  On March 31, 2014, Plaintiff filed a

letter seeking to introduce "[a]ccusatory [e]vidence" for the arrest of Defendants Dr. Given and

Dr. Zhang.  (Dkt. No. 24 at 1.)  On April 7, 2014, Plaintiff filed a letter requesting that the Court

---

[8] Plaintiff requested permission to file his Affidavit on July 2, 2014, (*see* Dkt. No. 39), which the Court granted, (*see* Dkt. No. 40).

assign a magistrate judge to adjudicate Plaintiff's criminal allegations.  (*See* Dkt. No. 26.)  On

April 14, 2014, Plaintiff filed a letter contending that Defendants could not make any res judicata

arguments in connection with a related case pending in New York Supreme Court.  (*See* Dkt. No.

28.)[9]  Plaintiff made additional arguments in support of this claim in a letter filed on April 16,

2014.  (*See* Dkt. No. 29.)  On April 24, 2014, Plaintiff filed what he termed his "Pre-Motion

Conference Concluding Remarks" three weeks before the pre-motion conference was held.  (Dkt.

No. 30.)  Later, on August 14, 2014, after Defendants' Motion To Dismiss was fully briefed,

Plaintiff filed a letter containing proposed talking points for oral argument on his Counterclaim.

(*See* Dkt. No. 47.)  Finally, in late November 2014, Plaintiff sent a letter to the Court disclosing

---

[9] In September 2010, Plaintiff filed a similar lawsuit in New York Supreme Court, Westchester County.  *See Kamdem-Ouaffo v. PepsiCo, Inc.*, No. 22625/2010 (N.Y. Sup. Ct. 2010).  (*See also* Mem. of Law in Supp. of Defs.' Motion To Dismiss 5 (Dkt. No. 34) (acknowledging lawsuit).)  Defendants assert that while the court in that case granted judgment in Defendants' favor on July 8, 2013, "a defense based on res judicata may be premature because the judgment in [that] action is not yet final" due to a pending appeal.  (*Id.* at 10 n.6 (italics omitted); *see also* Decl. of Jennifer C. Tempesta in Supp. of Defs.' Mot. To Dismiss Ex. 3, at 40 (Dkt. No. 37) (N.Y. Supreme Court decision granting summary judgment); Dkt. for *Kamdem-Ouaffo v. PepsiCo, Inc.*, No. 22625/2010 (N.Y. Sup. Ct. 2010) (noting that judgment for Defendants was granted).)  While the Court's Opinion here does not rest on res judicata grounds, it is worth noting that lower court orders have res judicata effect when they are issued, regardless of whether they are appealed.  *See Arnold v. Beth Abraham Health Servs., Inc.*, No. 09-CV-6049, 2009 WL 5171736 , at *4 (S.D.N.Y. Dec. 30, 2009) ("Under New York law, the pendency of an appeal does not deprive a challenged judgment of preclusive effect."), *aff'd on other grounds sub nom. Arnold v. 1199 SEIU*, 420 F. App'x 48 (2d Cir. 2011); *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 737 (S.D.N.Y. 2007) ("Courts long have held that the pendency of an appeal ordinarily does not suspend the preclusive effect of an otherwise final judgment."), *aff'd sub nom. Bondi v. Capital & Fin. Asset Mgmt. S.A.*, 535 F.3d 87 (2d Cir. 2008); *Aaron v. Aaron*, 768 N.Y.S.2d 739, 741 (App. Div. 2003) ("[A]bsent a stay, the pendency of an appeal from [a] judgment does not alter the finality or enforceability of that judgment."); *cf. DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Under New York law, the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." (internal quotation marks omitted)).

the name of an FBI investigator allegedly assigned to his case; the Court docketed a redacted version of this letter on December 1, 2014. (*See* Dkt. No. 48.)

Together with the Memorandum of Law that Plaintiff submitted in response to Defendants' Motion To Dismiss, Plaintiff included a proposed Second Amended Complaint. (*See* SAC.) While the conduct Plaintiff alleges in his Second Amended Complaint is almost entirely identical to that in Plaintiff's First Amended Complaint, a few differences are worth noting. First, Plaintiff added ScentSational Technologies LLC and Steven M. Landau as Defendants—two parties Plaintiff previously requested permission to join—and included allegations against them. (*See id.*) Second, Plaintiff withdrew his second, third, and sixth causes of action, which pertained to false statements allegedly made to the USPTO, and his fourth, fifth, and ninth causes of action, which pertained to alleged criminal conduct, instead requesting the "[i]nitiation [o]f [a] [s]eparate [c]riminal [c]omplaint [a]gainst . . . Defendants" PepsiCo, Dr. Zhang, and Dr. Given. (*See id.* at 25–26, 28.)[10]   Third, Plaintiff withdrew his thirteenth cause of action, his request for subpoenas, and instead requested joinder of ScentSational Technologies LLC and Steven M. Landau. (*See id.* at 32.) Fourth, Plaintiff added fifteen new causes of action, including a number of claims based on the New York Uniform Commercial Code. (*Id.* at 32–49.)

Defendants reviewed and responded to Plaintiff's proposed Second Amended Complaint in their Reply. (Defs.' Reply Mem. of Law in Further Supp. of Defs.' Mot. To Dismiss ("Defs.' Reply") 8–10 (Dkt. No. 46).) Therefore, without accepting the proposed Second Amended

---

[10] Claim numbers in this Opinion are the numbers Plaintiff assigned them in his proposed Second Amended Complaint.

Complaint for filing, the Court will consider the allegations and claims contained in the proposed Second Amended Complaint together with those contained in First Amended Complaint.[11]

## II. DISCUSSION

### A. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014).  In reviewing a complaint, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor."  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted).  Moreover, along with the Complaint itself, the Court "may consider . . . any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."

---

[11] The Court notes that "[i]t is within [its] discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss."  *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).  Indeed, Defendants argue that Plaintiff may not amend his pleadings in his brief at all.  (Defs.' Reply 8 (citing *Jacobson v. Peat, Marwick, Mitchell & Co*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977)).)  However, where new allegations in a pro se plaintiff's responsive memoranda "are consistent with the allegations contained" in the complaint, they may be read "as supplements to th[e] pleadings."  *Boyer v. Channel 13, Inc.*, Nos. 04-CV-2137, et al., 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005); *see also Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering "factual allegations made by [the] pro se [p]laintiff in [the plaintiff's] opposition papers" because they were "consistent with those in the initial complaint and amended complaints" (italics omitted)); *Gertskis v. U.S. E.E.O.C.*, No. 11-CV-5830, 2013 WL 1148924, at *1 (S.D.N.Y. Mar. 20, 2013) (considering allegations from the plaintiff's opposition memoranda "to the extent they are consistent with the [a]mended [c]omplaint"), *aff'd sub nom. Gertskis v. E.E.O.C.*, — F. App'x —, 2014 WL 6865499 (2d Cir. Dec. 8, 2014); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012) ("[B]ecause a pro se plaintiff's allegations must be construed liberally[,] it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." (italics omitted)).  It is this approach that the Court adopts here.

*ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 715 (2014).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))). Where, as here, a complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests. *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted).

B.  Analysis

Plaintiff's claims, in large part, turn on the validity and meaning of the Agreement, particularly the provisions concerning (a) with whom Plaintiff formed an employer-employee relationship, and (b) the assignment of Plaintiff's intellectual property rights.  Not unexpectedly, nearly the entirety of Defendants' Motion is therefore based on assertions about one, or both, of these provisions.  (*See* Defs.' Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 6–10, 12–13, 14–16 (Dkt. No. 34.)  The Court will therefore begin its analysis by evaluating the relevant provisions of the Agreement, and the claims based on the interpretation of these provisions.

1.  Dismissal of Plaintiff's Withdrawn Claims

The Court, as an initial matter, dismisses a number of Plaintiff's claims.  First, Plaintiff's second, third, and sixth causes of action, relating to false statements allegedly made to the USPTO, are dismissed because Plaintiff has voluntarily withdrawn them, (*see* Pl.'s Opp'n 12 ("The Plaintiff has conceded that criminal allegations for the offenses committed by Defendants at the United States Patent Office should be dismissed into a separate criminal proceeding."); *see also* SAC 25–26), and because no private right of action lies to correct false statements made to the USPTO under 35 U.S.C. § 115, the statute Plaintiff cites in support of his second and third claims, (*see* First Am. Compl. 26 (Dkt. No. 9)).  *See also Wise v. Hubbard*, 769 F.2d 1, 3 (1st Cir. 1985) (noting that § 115 "creates no duty between the patent applicant and the purported inventor.  Instead, because the [USPTO's] interest is in rewarding the true inventor with the issuance of a letter patent, the sole duty created is between the applicant and the Office."); *Newberg v. Schweiss*, No. 08-CV-4681, 2009 WL 3202380, at *6 (D. Minn. Sept. 30, 2009) ("Under 35 U.S.C. § 115, . . . . [t]he duty to disclose all inventors . . . is a duty owed to the

USPTO, not to potential co-inventors.  Indeed, breach of that statutory duty merely results in the patent being 'unauthorized by law and void.'" (quoting *Wise*, 769 F.2d at 3)).  Second, Plaintiff's fourth, fifth, and ninth claims, relating to alleged criminal conduct, are dismissed because Plaintiff has voluntarily withdrawn them, (*see* SAC 26, 28), and because "crimes . . . do not give rise to civil causes of action," *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).  The Court likewise declines to grant Plaintiff leave to file a separate criminal complaint containing these dismissed claims because "the law is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual."  *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").  Third and finally, Plaintiff's thirteenth cause of action, relating to a request for subpoenas, is dismissed because Plaintiff voluntarily withdrew this claim, (*see* SAC 32), and because subpoenas are a discovery tool such that a request for them does not constitute a cause of action, *see* Fed. R. Civ. P. 45.

The Court declines to rule on Plaintiff's request to join Defendants ScentSational Technologies LLC and Steven M. Landau.  The Court's dismissal of Plaintiff's First Amended Complaint, however, as discussed below, is without prejudice to Plaintiff renewing his request to join these Defendants or alleging additional claims against them.

### 2. Plaintiff's Employer-Employee Relationship

The terms of Plaintiff's employment are provided by Attachments B and C (collectively, the "Attachments") of the Agreement, (*see* SAC Ex. DMD III ("Attachments") at unnumbered

1–3).[12]  Both Attachments appear to bear Plaintiff's signature, (*see id.* at unnumbered *2–3*; *see also* Pl.'s Opp'n 4 (admitting Plaintiff signed Attachment B), and are governed by New York law, (*see* Defs.' Mem. 8 n.5 ("The [P]arties agree that New York law applies to the IP agreement."); *see also* Attachment B ¶ K ("THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK . . . .")).  Attachment B, the "Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property" characterizes the payment Plaintiff was to receive as being made "by [the] employer, the Staffing Supplier," and specifically explains that "[t]his Agreement does not constitute a contract of employment between [PepsiCo] and [the signatory]."  (Attachment B at unnumbered 1, ¶ C.)  Attachment C, the "Acknowledgment of Temporary Work Assignment," likewise includes a provision which provides that Plaintiff "understand[s] that [he is] an employee of the Staffing Supplier and . . . not an employee of PepsiCo[,]" and that "the Staffing Supplier, and not PepsiCo, is solely responsible for paying [his] compensation and any other benefits that [he] may be entitled to as an employee of Staffing Supplier."  (Attachment C ¶ 1.)  Attachment C also provides that Plaintiff "understand[s] that Staffing Supplier has assigned [him] to a temporary work assignment at PepsiCo . . . . for a defined period of time, the length of which may be increased or decreased."  (*Id.* ¶ 2)[13]

---

[12] The first two pages of the exhibit contain Attachment B, while the third page contains Attachment C.  (*See* Attachments.)  The Court will hereinafter cite the individual Attachments as "Attachment B" and "Attachment C."

[13] The Court considers Attachments B and C of the Agreement, as well as the Purchase Order, when evaluating Defendants' Motion because they are attached to, and referenced in, the proposed Second Amended Complaint.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."); *ASARCO*, 756 F.3d at 198 (noting that the Court "may consider . . . any written instrument attached to the complaint as an

On the basis of the plain language of the Agreement, Plaintiff's breach of contract claim (claim 1) is dismissed. *See Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 129 (S.D.N.Y. 2014) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss."). It is hornbook law that an entity must be a party to a contract for a claim of breach of that contract to lie, unless the entity has assumed or been assigned the contract. *See La Barte v. Seneca Res. Corp.*, 728 N.Y.S.2d 618, 620 (App. Div. 2001) ("[The] [p]laintiffs may not maintain a cause of action for breach of contract against those parties with whom [he or she] [was] not in privity."); *see also Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12-CV-1416, 2014 WL 3874193, at *12 (S.D.N.Y Aug. 5, 2014) (dismissing breach of contract claim because plaintiff failed to "establish the first element of [a] breach of contract claim, . . . the existence of a contract between [the plaintiff] and [the defendant]"); *Keywell L.L.C. v. Pavilion Building Installation Sys., Ltd.*, 861 F. Supp. 2d 120, 128 (S.D.N.Y. Mar. 12, 2012) ("In New York, privity is essential to a contract claim." (footnote omitted)); *Hotel Acquarius B.V. v. PRT Corp.*, No. 92-CV-4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992) ("[I]f an entity is not a party to a contract, no valid breach of contract claim exists against that entity."); *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has

---

exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies" (internal quotation marks omitted)); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (alteration and internal quotation marks omitted)); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

15

thereafter assumed or been assigned the contract.").  Under the Agreement, Plaintiff was clearly an employee of Subex, and not of PepsiCo.[14]  Plaintiff recognizes this fact in his submissions, (Pl.'s Opp'n 21 ("Plaintiff has at no time alleged that he was a PepsiCo employee . . . .")), and acknowledges that Subex, and not PepsiCo, was responsible for his payment, (*id.* at 18 (noting that "PepsiCo . . . had indeed willfully delegated duties to its business partner [Subex]," and that "PepsiCo did not have to delegate payment for . . . Plaintiff's IP to Subex")).  In fact, Plaintiff included a 2008 W-2 as an exhibit to his proposed Second Amended Complaint which identifies Subex, rather than PepsiCo, as Plaintiff's employer.  (*See* SAC Ex. DMD VI at unnumbered 1.) Therefore, under the plain terms of the Agreement, PepsiCo cannot be liable for any breach of contract under the Agreement, to which it was not a party.

Potentially in response to this issue, Plaintiff suggests that the "Purchase Order . . . issued on July 13th, 2008" modified Attachment B by "defin[ing] the specific terms of the payment for . . . Plaintiff's [i]ntellectual [p]roperty and . . . confidentiality."  (Pl.'s Opp'n 7–8, 17.)[15] Plaintiff alleges that the Purchase Order at issue "was updated until October 20th 2009 and specifically identified the amount of money to be paid by . . . PepsiCo . . . to . . . Plaintiff and . . . established that . . . Plaintiff had indeed delivered the [i]ntellectual property [at issue] to Defendant," (*id.* at 17), and that Defendants "breach[ed] and fail[ed] to perform according to the

---

[14] In his Memorandum of Law, Plaintiff argues that the Agreement constituted a "delegation" of payment.  (Pl.'s Opp'n 18.)  This argument is contradicted by the plain language of the Agreement.  (*See, e.g.,* Attachment B ¶ C ("This Agreement does not constitute a contract of employment between [PepsiCo] and [the signatory.").)  PepsiCo therefore had no responsibilities to Plaintiff under the Agreement which it could delegate.

[15] Plaintiff's allegations regarding misconduct stemming from a "failure to produce . . . the . . . Purchase Order," (Pl.'s Opp'n 22), or other information relating to Plaintiff's tenure at PepsiCo, (*see id.* at 9), are premature because they pertain to discovery.

payment terms set forth in. . . [the] Purchase Order," (*id.* at 7).  In support of this claim, Plaintiff cites § 3-119 of the New York Uniform Commercial Code, which provides that "'[a]s between the obligor and his immediate obligee or any transferee[,] the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction.'" (Pl.'s Opp'n 17 (italics omitted) (quoting N.Y. U.C.C. § 3-119).)

Contract modifications, like any contract, require offer, acceptance, and valid consideration.  *See Estate of Anglin ex rel. Dwyer v. Estate of Kelley ex rel. Kelley*, 705 N.Y.S.2d 769, 772 (App. Div. 2000) ("[A] change in an existing contract must have new consideration to support it." (internal quotation marks omitted)); *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (App. Div. 1980) ("Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms."); *see also AIU Ins. Co. v. TIG Ins. Co.,* 934 F. Supp. 2d 594, 602 (S.D.N.Y. 2013) ("A valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration." (alterations and internal quotation marks omitted)), *aff'd*, 577 F. App'x 24 (2d Cir. 2014).  Under this standard, the Purchase Order does not constitute a valid modification of the Agreement for two reasons.  First, Plaintiff, by his own admission, was unaware of the Purchase Order until May 2012, meaning it was impossible for him to have "accepted" any modifications of the Agreement contained therein prior to the termination of his employment.  (*See* Pl.'s Aff. ¶ 48 (Dkt. No. 42) ("Only during depositions for the Supreme Court of the State of New York case . . . did the Plaintiff come into knowledge of the Purchase Order [d]etails, in May 2012 . . . .").)  Second, the modification was not supported by adequate consideration.  Plaintiff's obligations under the Agreement—namely his employment and the assignment of his intellectual property—were the

17

same as those under the purported modified contract, and thus they could not have served as consideration for the modification. *See Tierney v. Capricorn Investors*, *L.P*, 592 N.Y.S.2d 700, 703 (App. Div. 1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration.").

The Purchase Order may also be interpreted, however, not as a contract modification, but rather as memorializing promises that were part of the Agreement itself, i.e., that Plaintiff would remain the named inventor of certain intellectual property and that PepsiCo would pay him the amount outlined in the Purchase Order. (*See* SAC ¶ 25 (referencing a "common understanding" that PepsiCo would credit Plaintiff's inventions to him); Pl.'s Aff. ¶ 27 (averring that "[P]laintiff's signature was given [on Attachment B] on the sole basis of the promises of payment made to the Plaintiff both . . . verbal[ly] and in writing as embodied in the Purchase Order").) There are several fatal flaws with such an interpretation. First, as an initial matter, no part of the Purchase Order suggests that Plaintiff was entitled to have his name remain on his intellectual property. Second, the Agreement contains a clause in Attachment B which provides that "[i]n the event that either [Plaintiff's] employer or [Plaintiff] has previously executed an agreement with [PepsiCo] relating to the work which [Plaintiff is] about to undertake, it is understood and agreed that the terms and provision of this Agreement will supersede any terms and conditions of such previously executed agreement." (Attachment B ¶ D.) This term, on its face, forecloses the applicability of any prior agreement that Plaintiff's name would remain on his inventions after their assignment, that he was PepsiCo's employee, or that he would receive certain compensation. Third, New York's parol evidence rule provides that "evidence outside the four corners of the document" is admissible to modify or contradict a written agreement "only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 986

N.E.2d 430, 436 (N.Y. 2013); *see also Polygram Holding, Inc. v. Cafaro*, 839 N.Y.S.2d 493, 493 (App. Div. 2007) ("Absent fraud or mutual mistake, the parol evidence rule precludes a party from offering evidence to contradict or modify an unambiguous contract."); *Telemundo Grp., Inc. v. Alden Press, Inc.*, 580 N.Y.S.2d 999, 1000 (App. Div. 1992) ("Extrinsic or parol evidence is admissible . . . where it would not modify or contradict the terms of the contract, but would explain ambiguities in the contract."(internal quotation marks omitted)).  Because the Agreement is unambiguous as to Plaintiff's assignment of his intellectual property unconditionally, and as to the fact that Subex, and not PepsiCo, is Plaintiff's employer, parol evidence is not admissible to suggest that PepsiCo promised that Plaintiff's name would remain on his inventions, or that PepsiCo owed him compensation *as his employer*.

Giving Plaintiff the benefit of the doubt, the Court could construe the Purchase Order as explaining another otherwise ambiguous term in the contract, namely the reference in Attachment B to "payment to [Plaintiff] by [his] employer, the Staffing Supplier," such that the parol evidence rule would not bar consideration of the Purchase Order.  (Attachment B at unnumbered 1).[16]  However, even if the Purchase Order is relevant to the terms of the

---

[16] On its face, the Purchase Order identifies Subex as the "vendor," while the notes section indicates that Subex billed PepsiCo for Plaintiff's work, suggesting that the Purchase Order reflected an agreement between Subex and PepsiCo involving PepsiCo's payment to Subex for contract work, rather than an agreement with Plaintiff himself.  (*See* Pl.'s Opp'n Ex. DMD V (Purchase Order).)

The Court is also skeptical that PepsiCo would have agreed to pay a six-figure sum to Plaintiff for his intellectual property, and then, instead of including such figure in the employment agreement, only ambiguously mentioned such sum in an unsigned purchase order. Indeed, the New York Court of Appeals rejected a similar claim (albeit on a motion for summary judgment) that an employment contract contained an implied term that provided a $170,000 bonus, noting that the parties "would be expected to make reference to such a large sum of money in the agreement with particularity."  *Namad v. Salomon, Inc.*, 543 N.E.2d 722, 723 (N.Y. 1989).  In any event, the Court rejects Plaintiff's claim here on the grounds discussed above.

Agreement, it does not suggest that Plaintiff was entitled to the $133,007.50 he claims.  Indeed, the Purchase Order suggests that Plaintiff received hourly pay, rather than a fixed fee, and that his pay rate was $40 per hour.  (Pl.'s Opp'n Ex. DMD V (Purchase Order); *see also id.* Ex. DMD II at unnumbered 4 (job description, indicating a "pay rate" of $40.00).)  The $133,007.50 figure that Plaintiff cites is labeled as a "PO Limit Total," which reflects the combined total of two separate pay limits in the Purchase Order for standard and overtime work of $118,800 and $14,107.50, respectively.  (*Id.* Ex. DMD V.)  While Plaintiff argues, in his August 11, 2014 letter to the Court, that "limit" in this case means a "lower limit," that interpretation contradicts the plain meaning and regular usage of such term.  *See Brooke Grp. Ltd. v. JCH Syndicate 488,* 663 N.E.2d 635, 638 (N.Y. 1996) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning."); *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (App. Div. 1990) ("Words and phrases are given their plain meaning.  Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement." (citations omitted)); *cf. Liberty Mut Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05-CV-217, 2008 WL 190310, at *15 (S.D.N.Y. Jan. 16, 2008) ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." (internal quotation marks omitted)).  Had PepsiCo intended Plaintiff's interpretation of the contract, it would have used the word "minimum," which implies a lower limit, rather than "limit," which implies a ceiling.[17]  Moreover, it strains reason to believe that PepsiCo would ever

---

[17] The dictionary definition of "limit" is "[a] point or level beyond which something does not or may not extend or pass."  Limit, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/limit (last accessed Jan. 6, 2015).  Construing "limit" in the Purchase Order as an upper limit would set definite bounds, consistent with this definition of the term, whereas interpreting the term as a minimum payment "delimits" Plaintiff's pay altogether, as any amount higher than the amount specified in the Purchase Order would be permissible under the Agreement according to such an interpretation.

issue an unsigned purchase order for *minimum* compensation, never mind one that specifies an hourly salary that a minimum compensation provision would render superfluous, especially given that it is Subex, and not PepsiCo, which was required to pay Plaintiff.  *See Am. Express Bank*, 562 N.Y.S.2d at 614 ("A contract should be construed so as to give full meaning and effect to all of its provisions.").  Therefore, the Court finds no support on the face of the Purchase Order for Plaintiff's contention that he is owed $133,007.50 under the Agreement, such that payment of less than that amount would constitute a breach.  Rather, the Purchase Order provides, at most, a *maximum* amount that Plaintiff may receive under the Agreement.[18]

Plaintiff admits that he received $82,142, which amounted to $56,384 after taxes, as compensation.  (*See* SAC ¶ 52.)  Though Plaintiff alleges that he received "[n]o other valuable consideration," (Pl.'s Opp'n 4), Plaintiff does not allege that he was deprived of "the use of [PepsiCo's] facilities or materials, or of private or proprietary information," as promised in the Agreement, (Attachment B at unnumbered 1).  Plaintiff appears to suggest instead that he simply received no other *monetary* compensation for his property.  (*See* Pl.'s Aff. ¶¶ 35, 42 (citing W-2 statement as evidence that Plaintiff received no other compensation); *id.* ¶ 38 (noting that Plaintiff "did not receive any additional income from any source").)  Therefore, there is no reason to doubt that Plaintiff received the consideration that he was promised on the face of the Agreement, or as suggested by the Purchase Order.  On that basis, and because Plaintiff was an

---

[18] Plaintiff fails to explain why he is entitled to an interest in the intellectual property he transferred that is proportionate to the amount of compensation he alleges is owed.  (*See* SAC ¶ 238).  Even if Plaintiff could recover from Subex, because Plaintiff's contract was with Subex for the *benefit* of PepsiCo, rather than with PepsiCo itself, he is not entitled to restitution.  *Cf. U.S. E. Telecomms. Inc. v. US W. Commc'ns Servs.*, *Inc.*, 38 F.3d 1289, 1297 (2d Cir. 1994) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of the performance of the third person." (quoting Restatement of Restitution § 110 (1937)).)

employee of Subex, and not of PepsiCo, Plaintiff's breach of contract claim against PepsiCo is dismissed.

3.  Intellectual Property Provision

For purposes of Plaintiff's assignment of intellectual property, the pertinent portion of the Agreement is Attachment B.  Attachment B provides, in relevant part, that:

In consideration of payment to me by my employer, the Staffing Supplier . . . for the performance of work or assignments for PepsiCo, Inc. . . . and other good and valuable consideration, including the use on behalf of Company of its facilities or materials, or of private or proprietary information owned by [PepsiCo] or its suppliers or customers, I agree to the following provisions:

A.  I hereby assign and agree to assign to [PepsiCo] all my right, title and interest in and to all inventions, discoveries, improvements, ideas, products, formulae, machines, mask works, designs, methodologies, processes, know-how, research and development, software, source code, computer or other apparatus programs and related documentation, and other works of authorship . . . whether or not patentable, copyrightable or subject to other forms of protection, made created, developed, written or conceived by me during the period of such work or performance of assignments, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part

1.  In the course of such work assignment, or
2.  Which are suggested by or result from any task assigned to me or work performed for or on behalf of Company relating to my assignment, or
3.  With the use of Company's time, material, facilities, or private or proprietary information;

B.  I will . . . execute a specific assignment of title to Company and do anything else reasonably necessary to enable company to secure a patent . . .

C.  This Agreement does not . . . confer upon me any rights by license or otherwise in my Intellectual Property to which I may have access . . .

D.  The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged . . .

K.  THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK . . . .

(Attachment B at unnumbered 1–2.)  While the Agreement, as noted above, is governed by New York law, the operation of the assignment of rights is governed by Federal Circuit law.  *See Picture Patents LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 135 (S.D.N.Y. 2011) ("[T]he question of whether contractual language effects a present assignment of patent rights, or an agreement to assign rights in the future, is resolved by Federal Circuit Law." (internal quotation marks omitted)), *aff'd* 469 F. App'x 912 (Fed. Cir. 2012).

On its face, Attachment B is a clear and explicit assignment of all intellectual property from Plaintiff to PepsiCo.  The "I hereby assign . . . my right title and interest" clause contained in the Attachment B "indicate[s] a present assignment of a future invention," meaning all of the intellectual property that Plaintiff created during the period of his employment was automatically transferred to PepsiCo as soon as it was invented.  *Id.* at 135–36 (noting that "[t]he present assignment of a future invention divests the inventor-assignor of ownership of the invention and automatically vests ownership of the invention, when invested, to the assignee" (internal quotation marks omitted)); *see also Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) ("Because the assignment clause . . . states that the employee agrees to 'hereby assign' all 'Intellectual Property,' it is an express assignment of rights in future inventions that automatically assigned rights . . . without the need for any additional act.").

The fact that Plaintiff contractually transferred his intellectual property to PepsiCo undermines a number of Plaintiff's claims.  The Court considers them in the order that Plaintiff alleges them in his proposed Second Amended Complaint.  First, in order to claim wrongful appropriation of intellectual property (claims 7 and 24), Plaintiff "must establish some wrongful appropriation or use of [*his*] intellectual property."  *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 (2d Cir. 2006); *see also Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp.

2d 293, 297–98 (S.D.N.Y 2008) (citing *Dow Jones* for this proposition, and granting summary judgment on the plaintiffs' wrongful appropriation claim because they "failed to establish that they have an intellectual property right that has been misappropriated").  While Plaintiff argues that the Defendants are not "holders in due course of" the intellectual property at issue because "the Purchase Order . . . has not been honored," (SAC ¶ 228), as discussed above, the Purchase Order is not a valid modification of the Agreement nor a contract in its own right, and does not entitle Plaintiff to the compensation he alleges, create an employment agreement with PepsiCo, or entitle Plaintiff to rescind the assignment of his intellectual property rights, which assignment vested upon invention.  Therefore, Plaintiff has no contractual or residual right to his inventions, and his wrongful appropriation claims are dismissed.  For the same reason, Plaintiff's joint owners claim (claim 25) is dismissed.  Plaintiff does not retain an interest in his inventions "in proportion to the [Purchase Order] proportion that the Defendant[s] did not honor" such that Plaintiff is a joint owner or has any remaining interest in his inventions at all.  (*Id.* ¶ 238.)

Second, Plaintiff makes two fraud-based claims, "fraudulent obtaining of signature" (claim 8), and "fraudulent intent breach of agreement for assignment of intellectual property" (claim 14).  These claims, which allege that "[D]efendants used fraudulent means to take away from him his intellectual property," (Pl.'s Opp'n 7), are dismissed because Plaintiff fails to allege, in either case, a cause of action upon which relief can be granted.

It long has been clear that "[a]llegations of fraud are subject to a heightened pleading standard."  *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,* 723 F.3d 192, 197 (2d Cir. 2013); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  "When alleging fraud, a party

must state with particularity the circumstances constituting fraud, . . . requir[ing] the plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata*, 723 F.3d at 197 (citation and internal quotation marks omitted). Plaintiff fails to satisfy the fourth prong of the pleading standard because he does not specify any federal or state law that Defendants have violated. Moreover, even if Plaintiff intended to allege common law fraud under New York law, he fails to allege facts that establish the elements of a common law fraud claim: "(1) a misrepresentation of material fact, (2) made with fraudulent intent, (3) upon which the plaintiff reasonably relies to his (4) economic detriment." *Nirvana Int'l., Inc. v. ADT Sec. Servs., Inc.*, 881 F. Supp. 2d 556, 563 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 12 (2d Cir. 2013).

Plaintiff's first fraud-based claim, "[f]raudulent [o]btaining [o]f [s]ignature" rests only on the conclusory allegation that the signatures on PepsiCo's patent applications were fraudulent because Defendants "were not the inventors of the Plaintiff's intellectual property." (SAC ¶¶ 139–140.) Plaintiff does not explain how PepsiCo's actions were fraudulent given that an assignee of intellectual property is permitted to make a patent application. *See* 35 U.S.C. § 118 ("A person to whom the inventor has assigned . . . the invention may make an application for patent."); *cf. id.* § 115 (providing that an inventor's declaration is only required for those applications commenced "under section 111(a)" or those that "commence[] the national stage under section 271"); *Deere & Co. v. Van Natta*, 660 F. Supp. 433, 436 (M.D.N.C. 1986) (noting that, because the plaintiff could file a patent application as an assignee, there was no need to order the defendant inventor to sign a declaration indicating there were no bars to the patent applications at issue). Plaintiff also does not allege that he relied on any fraudulently-obtained

signature, *cf. Nirvana Int'l*, 881 F. Supp. 2d at 563 ("[The] [p]laintiff did not rely on his forged signature so [the] [p]laintiff has no claim for fraud."), nor does he explain why, given that Plaintiff assigned his intellectual property rights to PepsiCo, any fraudulently-obtained signature caused him economic harm.

Plaintiff's second fraud-based claim, "[f]raudulent [i]ntent [b]reach [o]f [a]greement [f]or [a]ssignment [o]f [i]ntellectual [p]roperty," rests on the allegation that "[t]he order to expunge . . . [P]laintiff's name from his inventions" was improper. (SAC ¶ 169.) Like Plaintiff's first fraud claim, this claim also fails to include any allegations of reliance on a misrepresentation of material fact or resulting economic detriment. Moreover, as discussed above, even if the Parties had come to some "understanding" that Plaintiff was to remain a named inventor, (*see id*. ¶ 25), Plaintiff does not allege that such understanding was a valid contract modification, nor can an oral agreement provide additional terms under New York's parol evidence rule, given that the Agreement *unambiguously* indicates that Plaintiff agreed to assign his intellectual property rights to PepsiCo without condition. *See Schron,* 986 N.E.2d at 433 (noting that New York's parol evidence rule provides that "evidence outside the four corners of the document" is admissible to alter or add a provision to a written agreement "only if a court finds an ambiguity in the contract"). Plaintiff's fraud claims are therefore dismissed.

Third, Plaintiff's unjust enrichment claim (claim 11) is dismissed. Plaintiff alleges that Defendants were "unjustly enriched through their wrongful appropriation of . . . Plaintiff's [i]ntellectual [p]roperty and have wrongfully secured for their own benefit valuable utility patents of commercial value that PepsiCo's competitors would be interested in using [in] the market place." (SAC ¶ 154.) While this claim appears to be a species of Plaintiff's wrongful appropriation claims, which the Court has already dismissed, the existence of a valid contract

also renders unjust enrichment unavailable as a remedy. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *see also Arbitron, Inc. v. Kiefl*, No. 09-CV-4013, 2010 WL 3239414, at *7 (S.D.N.Y. Aug. 13, 2010) ("Unjust enrichment is not available where there is a valid contract between the parties covering the same subject matter."); *AngioDynamics, Inc. v. Biolitec, Inc.*, 606 F. Supp. 2d 300, 305 (N.D.N.Y. 2009) ("Because the dispute is covered by [a] contract, a claim in unjust enrichment cannot proceed."); *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York] have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute . . . .").

The Court recognizes that, under Federal Rule of Civil Procedure 8(d), a plaintiff can plead in the alternative such that he can challenge the validity of the contract *and* allege unjust enrichment. *See Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir.1999) ("[Rule 8(d)] offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss."). However, where a plaintiff, as here, fails to challenge the validity of a contract that governs the subject matter at issue, and instead alleges breach of said otherwise enforceable contract, under New York law he or she cannot plead unjust enrichment in the alternative. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586–87 (2d Cir. 2006) (noting that an unjust enrichment claim cannot be plead in the alternative when there is a "valid and enforceable contract governing . . . [the] subject matter");

*King's Choice Neckwear, Inc. v. Pitney Bowes, Inc*., No. 09-CV-3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009) ("Unjust enrichment may be plead in the alternative where the plaintiff challenges the validity of the contract; it may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract."), *aff'd sub nom. Kings Choice Neckwear, Inc. v. Pitney Bowes, Inc.,* 396 F. App'x 736 (2d Cir. 2010); *see also Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, No. 13-CV-5564, 2014 WL 3127729, at *4 (E.D.N.Y. July 3, 2014) (dismissing unjust enrichment claim, plead in the alternative with a breach of contract claim, because the plaintiff did not challenge the insurance policy at issue); *AngioDynamics*, 606 F. Supp. 2d at 305 (dismissing unjust enrichment counterclaim, plead in the alternative, "[b]ecause the dispute [at issue] [was] covered by the [undisputed] contract, [meaning] a claim in unjust enrichment [could not] proceed"); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,* 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (dismissing unjust enrichment claim, plead in the alternative, noting that "[Plaintiff's] failure to allege that the contracts at issue are invalid or unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter.").  *But see St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010) ("Though some cases suggest that a plaintiff's mere allegation of an enforceable contract is enough to prevent him from even *pleading* an alternative claim for unjust enrichment, that position cannot be reconciled with the text of Rule 8(d), and is unpersuasive to this court's analysis." (footnote omitted)).  Because Plaintiff does not challenge the validity of the Agreement (its exact terms, as allegedly modified by the Purchase Order, notwithstanding), and the Agreement governs Plaintiff's rights to the intellectual property at issue, Plaintiff's unjust enrichment claim is dismissed.

Fourth, Plaintiff's correction of inventorship claim (claim 10), made purportedly under 35 U.S.C. § 256 and presumably for the five patents (included the granted patent) Plaintiff outlined in his Amended Complaint, is dismissed.  (*See* SAC 28.)  The Federal Circuit has made clear that while 35 U.S.C. § 256 "provides a private right of action to challenge inventorship" for issued patents, 35 U.S.C. § 116, which governs inventions, "does not provide a private right of action to challenge inventorship of a pending patent application."  *HIF Bio., Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010).  Thus, Plaintiff cannot bring a cause of action for a correction of inventorship for the four pending patent applications.  As far as correction of inventorship for the single issued patent is concerned, while a private right of action may exist, because Plaintiff assigned his intellectual property rights to PepsiCo, he lacks standing to make such a claim.  Plaintiff has no remaining ownership interest in the patents, and he has alleged no other financial or reputational interest on which to base standing.  *See Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325–27 (Fed. Cir. 2009) (noting that for a plaintiff to have standing to correct inventorship, the plaintiff must allege facts sufficient to show an "ownership interest" or a "concrete financial interest" in the patent at issue, and finding no standing for such claim because the plaintiff "affirmatively transferred title to the patents to [defendant]" and thus could not stand to gain from them unless he "obtain[ed] rescission of the patent assignments" (internal quotation marks omitted)); *see also Vita-Herb Nutriceuticals, Inc. v. Probiohealth, LLC*, No. 11-CV-1463, 2013 WL 1182992, at *4 (C.D. Cal. Mar. 20, 2013) (finding no standing for a correction of inventorship claim because the plaintiff was "barred by the terms of [a release] from pursuing any claim for co-ownership" and thus lacked a financial interest); *Swanson v. ALZA Corp.*, No. 12-CV-4579, 2013 WL 968275, at *4  (N.D. Cal. Mar. 12, 2013) ("Where an inventor assigns all of his interest in an invention to others, he retains no

29

financial interest in the patents and therefore no interest sufficient for him to have standing to pursue a § 256 claim." (internal quotation marks omitted)).  For these reasons, Plaintiff's correction of inventorship claim is dismissed.

Fifth, Plaintiff's constructive trust claim (claim 12) is dismissed.  "Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 646 (2d Cir. 2004); *see also Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) (same); *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) (same).  However, "these elements are not talismanic; a court may impose a constructive trust in the absence of some of the factors." *A. Brod, Inc. v. SK&I Co.*, 998 F. Supp. 314, 327 (S.D.N.Y. 1998).  In this context, under New York law, a constructive trust cannot be imposed when the party seeking it is not in possession of any indicia of ownership.  *See Bontecou v. Goldman*, 477 N.Y.S.2d 192, 194 (App. Div. 1984) ("Generally, a constructive trust may be imposed when property has been acquired under such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest therein."); *cf. A. Brod,* 998 F. Supp. at 327–28 (noting, in a case concerning a motion for summary judgment on a copyright claim, that a constructive trust is only appropriate if the holder of the property at issue is "not a bona fide purchaser"); *Majer v. Schmidt*, 564 N.Y.S.2d 722, 725 (App. Div. 1991) ("[I]f a constructive trust is otherwise appropriate, it will be imposed unless the party who received the property is a bona fide purchaser, i.e., one who took without notice that it had been wrongfully obtained." (italics omitted)).  Because, by operation of

Attachment B, Plaintiff has no remaining ownership interest in the intellectual property at issue,
he cannot seek a constructive trust.

Likewise, "[i]t is well-established under New York law" that, as an equitable remedy,
constructive trusts are inappropriate "where there is an adequate remedy at law," namely one
under contract law.  *In re First Cent. Fin. Corp.,* 377 F.3d 209, 215 (2d Cir. 2004) (internal
quotation marks omitted); *see also United States v. Ribadeneira*, 920 F. Supp. 553, 556
(S.D.N.Y. 1996) (finding that because the petitioners had "an adequate remedy at law, it would
be inappropriate to afford [them] equitable relief in the form of a constructive trust), *aff'd*, 105
F.3d 833 (2d Cir. 1997); *Cuomo v. Uppal*, 892 N.Y.S.2d 49, 50 (App. Div. 2009) (noting that
because the appellant had "adequate legal remedies" it was "not necessary to impose a
constructive trust"); *Bertoni v. Catucci*, 498 N.Y.S.2d 902, 905 (App. Div. 1986) ("As an
equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a
legal remedy is inadequate.").  While Plaintiff claims that Defendants breached the employment
contract by failing to adequately compensate Plaintiff, Plaintiff does not contest that the
Agreement, as allegedly modified by the Purchase Order, governs his rights to the intellectual
property at issue and any compensation related thereto.  (*See*, *e.g.,* SAC ¶ 238 (arguing that
Plaintiff retains an interest in his intellectual property in proportion to the amount of the
Purchase Order he has not been paid); Pl.'s Aff. ¶ 27 (averring that "[P]laintiff's signature was
given [on Attachment B] on the sole basis of the promises of payment made to . . . Plaintiff both
in verbal and in writing as embodied in the Purchase Order").)  Therefore, the equitable remedy
of a constructive trust is unavailable.  *See Islip U-Slip LLC v. Gander Mountain Co.*, 2 F. Supp.
3d 296, 308 (N.D.N.Y. 2014) (dismissing constructive trust claim because the plaintiff alleged
the existence of a contract and breach of that contract, and did not allege that a "legal remedy—

i.e., monetary damages—would be inadequate" (italics omitted)); *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) (rejecting constructive trust claim because "[i]t is well established that the existence of a contract precludes a claim for a constructive trust"). For these reasons, Plaintiff's constructive trust claim is dismissed.

Sixth, Plaintiff's wrongful course of dealing claims (claims 21 and 22) are dismissed. Plaintiff cites N.Y. U.C.C. Law § 1-205(2) (§ 1-303(c)), which describes usage of trade as "any practice or method of dealing having such regularity . . . as to justify an expectation that it will be observed with respect to the transaction in question," in support of these claims.[19] However, Plaintiff fails to allege how usage of trade is relevant to the Agreement. Rather, Plaintiff only makes conclusory allegations that Defendants "did not follow the [c]ourse of [d]ealing" and that Defendants Dr. Given and Dr. Zhang "knew [that] Plaintiff's work and inventions . . . [were] conceptualized and reduced to practice" before they became involved with their parent projects. (SAC ¶¶ 212, 217–18.) Even if the Court assumes that Plaintiff intended to cite § 1-205(1) (§ 1-303(b)), which defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction . . . [that] establish[es] a common basis of understanding for interpreting their expressions and other conduct," Plaintiff still fails to allege how such "course of conduct" was established, how Defendants failed to follow it, how it trumps the Agreement, and how it would constitute a cause of action. In fact, construing Plaintiff's claim liberally, it appears to be a species of Plaintiff's breach of contract claim, in which Plaintiff alleges that that he only signed the Agreement on the basis of certain oral

---

[19] Some of the provisions of the N.Y. Uniform Commercial Code that Plaintiff cites have been reorganized and renumbered. *See* 2014 N.Y. Sess. Laws ch. 505 (A. 9933) (McKinney). When applicable, the Court includes parenthetical citations to the current Code for ease of reference. All quotations are from the current Code.

understandings that Defendants have not honored.  The Court has, however, already dismissed this claim.

Plaintiff also cites 35 U.S.C. §§ 116 (inventors) and 118 (filing by other than inventor) in support of his wrongful course of dealing claims.  (*See* SAC ¶¶ 211, 216.)  Plaintiff does not, however, allege that his intellectual property was "made by two or more persons jointly," such that he would be considered an "omitted inventor" under the statute.  35 U.S.C. § 116.  Indeed, because Plaintiff assigned his intellectual property to PepsiCo, § 118 provides that PepsiCo was permitted to make an application for patent.  *Cf. Deere*, 660 F. Supp. at 436 (noting that, because the plaintiff could file a patent application as an assignee, there was no need to order the defendant inventor to sign a declaration indicating there were no bars to the patent applications at issue).  Moreover, as discussed above, 35 U.S.C. § 115 creates "no duty between the patent applicant and the purported inventor," but rather "the sole duty created is between the applicant and the office."  *Wise*, 769 F.2d at 3; *Newberg*, 2009 WL 3202380, at *6 ("Under 35 U.S.C. § 115 . . . . [t]he duty to disclose all inventors . . . is a duty owed to the USPTO, not to potential co-inventors.  Indeed, a breach of that statutory duty merely results in the patent being 'unauthorized by law and void.'" (citation omitted) (quoting *Wise*, 769 F.2d at 3)).  Therefore, Plaintiff's wrongful course of dealing claims are dismissed.[20]

---

[20] The Court notes that Plaintiff is correct that, after publication, the USPTO does not permit a protest of a patent application without the consent of the applicant.  *See* Manual of Patent Examining Procedure 1901.6(V)(A), U.S. Patent and Trademark Office, available at http://www.uspto.gov/web/offices/pac/mpep/s1901.html#d0e194658 (last accessed Feb. 18, 2015).  (*See also* Pl.'s Opp'n 10.)  However, the fact that Defendants are unlikely to consent to such a protest does not mean Plaintiff has a cause of action based on the same claim in federal court.

Seventh, Plaintiff's claim, that PepsiCo "acted in bad faith" in not honoring the Purchase Order "by subsequently ordering . . . Plaintiff's name to be expunged from his inventions" and "by not answering . . . Plaintiff's request for amendment" (claim 23), is dismissed.  (SAC ¶ 223.) In support of this claim, Plaintiff cites N.Y. U.C.C. Law § 1-203 (§ 1-304), which provides that "[e]very contract or duty . . . imposes an obligation of good faith in its performance and enforcement."  However, this statute "does not support an independent cause of action."  *Id.* Official Comment; *see also J.C. Penny Corp. v. Carousel Ctr. Co.,* 306 F. Supp. 2d 274, 281 (N.D.N.Y. 2004) (same), *aff'd*, 160 F.3d 97 (2d Cir. 1998); *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 792 (S.D.N.Y. 1997) (same).  Moreover, even if there were a cause of action under § 1-203 (§ 1-304), Plaintiff fails to allege that PepsiCo was party to a contract that could have imposed such a duty.  As discussed above, the Purchase Order was not a valid modification to the Agreement, nor was it a contract in its own right, and therefore PepsiCo could not have acted in bad faith by failing to honor it.[21]  For these reasons, Plaintiff's claim that PepsiCo violated the "[o]bligation [o]f [g]ood [f]aith [a]nd [l]ack [o]f [s]atisfaction" is dismissed.

Eighth and finally, Plaintiff's negligence claim (claim 27) is dismissed.  Plaintiff's claim is based solely on the allegation that Defendants' negligence resulted in their "wrongfully claim[ing] the ownership and inventorship of . . . Plaintiff's intellectual property."  (SAC ¶ 251.) The Court has already found that Defendants' actions in filing for the patents at issue were not wrongful.  *See* 35 U.S.C. § 118 ("A person to whom the inventor has assigned . . . the invention may make an application for patent.").  Moreover, Plaintiff has failed to allege any elements of the negligence, e.g., a duty and breach thereof, *see, e.g., In re MS Angeln GmbH & Co. KG*, 10

---

[21] Even if the Purchase Order created a contract between PepsiCo and Plaintiff, the Court has already found that Plaintiff received what he was promised under that document.

F. Supp. 3d 424, 430 (S.D.N.Y. 2014) (noting that the elements of common law negligence are "duty of care, breach of duty, causation, and damages"), and "[a] contract action cannot be converted into one arising in tort 'merely by alleging that the contracting party did not intend to meet its contractual obligations,'" *Aniero Concrete Co. v. N.Y.C. Const. Auth.*, No. 94-CV-3506, 2000 WL 863208, at *32 (S.D.N.Y. June 27, 2000) (quoting *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994)).  Plaintiff's negligence claim is therefore dismissed.

### 4.  Remaining Claims

The dismissal of the above claims notwithstanding, Plaintiff makes additional claims that pertain to conduct outside the context of the Agreement itself.  These claims are equally without merit.

First, Plaintiff makes a number of claims (claims 15, 16, 17, 18, 19, 20, and 26) based principally on Article 3 of the New York Uniform Commercial Code, which governs commercial paper, i.e., negotiable instruments.  *See* N.Y. U.C.C. Law § 3-101; *id.* cmt. ("This Article represents a complete revision and modernization of the Uniform Negotiable Instruments Law.").  Indeed, each of the provisions on which Plaintiff relies refers to negotiable instruments. *See id.* §§ 3-105 (conditionality of instruments), 3-303 (taking of instruments for value), 3-304 (notice of claim or defense to instrument), 3-404 (unauthorized signatures on instruments), 3-405 (impostor signatures on instruments), 3-406 (negligence altering instrument), 3-408 (consideration to become a holder in due course of an instrument), 3-507 (dishonored instrument), 3-603 (payment or satisfaction or an instrument).  (*See also* SAC 33–39, 45–46

(citing these provisions).)[22]  While Plaintiff characterizes Attachment B and the Purchase Order as commercial paper, (*see* Pl.'s Opp'n 12), the contracts at issue in this Action are not negotiable instruments, and therefore the cited provisions of New York law do not apply, *see* N.Y. U.C.C. Law § 3-104 ("Any writing to be a negotiable instrument within this Article must [be] . . . . .(a) a 'draft' ('bill of exchange') if it is an order; (b) a 'check' if it is a draft drawn on a bank and payable on demand; (c) a 'certificate of deposit' if it is an acknowledgment by a bank of a receipt of money with an engagement to repay it; (d) a 'note' if it is a promise other than a certificate of deposit"); *Stroll v. Epstein*, 818 F. Supp. 640, 643 n.4 (S.D.N.Y. 1993) ("[T]he present contract is not a negotiable instrument because it is not payable to order or to bearer." (internal quotation marks omitted) (citing N.Y. U.C.C. Law § 3-104)); *President, etc. of Manhattan Co. v. Morgan*, 210 N.Y.S. 460, 462 (App. Div. 1925) ("Written contracts are not negotiable, because by their terms, they are payable or insure to the benefit of the bearer."), *aff'd*, 150 N.E. 594 (N.Y. 1926). Likewise, the Purchase Order is not a negotiable instrument because it is signed by neither the alleged maker, PepsiCo, nor the alleged drawer, Plaintiff.  *See* N.Y. U.C.C. Law § 3-104 (providing that to be "a negotiable instrument," a writing must "be signed by the maker or drawer").  Therefore, these claims are dismissed as without merit because they have no basis in law, nor any application to this case.[23]

---

[22] Claim 17 also makes reference to N.Y. U.C.C. Law § 1-201(32) (§ 1-201(b)(29)), which defines "Purchase."  Though Plaintiff cites this provision as proof of the meaning of "purchase order," (*see, e.g.,* Dkt. No. 47 at 1), the provision has no relevance to the claims at issue in this case.

[23] Moreover, insofar as Plaintiff alleges that "[o]nly the inventor can authorize a patent application to be made," this claim, as discussed above, is contradicted by 35 U.S.C. § 118, which provides that the assignee of an invention may file for a patent application, and contains no provision requiring authorization by the inventor.

Second, Plaintiff alleges "[r]acism, [r]acial [d]iscrimination, [h]umiliation, [i]nsults [a]nd [d]enigration" (claim 28).  (SAC 47.)  Plaintiff's support for this claim is (a) his allegation that PepsiCo's Vice President for Research and Development, Valerie Jacklin, sent an email to Dr. Given and the Director of the Ingredient Technology group indicating that she was "not sure [they] want[ed] [Plaintiff] [o]n [t]he [i]nvention [l]ist," and that this was because of unspecified "stereotypes and racial clichés about . . . Plaintiff as a person of . . . black skin;" (b) Plaintiff's allegation that Defendants articulated this position to the U.S. government, together with the "representation that . . . Plaintiff was not able to do any work and . . . went to work only to look for opportunities for predatory sexual intercourse activity on women;" and (c) Plaintiff's allegation that he was told by an unnamed human resources manager that he was "'culturally unfit'" for employment because he was "a black male [with] an opinion on scientific matters that was contrary to that of his peers of [another] skin color." (*Id.* ¶¶ 65, 255, 257–58 (italics omitted).)[24]  While Defendants' conduct, if truthfully alleged, would be reprehensible, it is nonetheless facially insufficient to state a claim.  Plaintiff does not allege what law, state or federal, Defendants have violated.  Moreover, the claim lacks specific factual allegations, and instead rests on the conclusory allegation that Defendants' actions, both in taking credit for Plaintiff's inventions and terminating his employment, were motivated by racial animus.  Such allegation fails to state a claim for racial discrimination.  *See Phifer ex rel. Phifer v. City of New York*, No. 99-CV-4422, 2003 WL 1878418, at *6 (S.D.N.Y. Apr. 15, 2003) (dismissing racial discrimination claim because, inter alia, "[t]he complaint sets forth only conclusory assertions . .

---

[24] Plaintiff also alleges that Defendants' "legal counsel made comments in the presence of Plaintiff that 'justice . . . is . . . a hater of the black people aka nigga behind closed doors.'" (SAC ¶ 261 (alterations in original) (italics omitted).)  Additionally, in his Affidavit, Plaintiff names a PepsiCo employee that he alleges PepsiCo thought was a target of his sexual advances. (*See* Pl.'s Aff. ¶ 114.)

. and fails to specifically allege the circumstances giving rise to a plausible inference of racially discriminatory intent" (internal quotation marks omitted)); *cf. Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of the elements of a cause of action, supported by mere conclusory statements"); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (affirming the district court's rejection of affidavits that made only "bald assertions and legal conclusions" of "racism and a racially hostile working environment"). Plaintiff's racism-based claim is therefore dismissed because the allegations are "simply too thin and conclusory to support a facially plausible claim." *Doner-Hendrick v. N.Y. Inst. of Tech.*, No. 11-CV-121, 2011 WL 2652460, at *7 (S.D.N.Y. July 6, 2011).

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion To Dismiss is granted. Plaintiff's First Amended Complaint is dismissed without prejudice. Plaintiff may file a Second Amended Complaint within thirty days that specifically addresses the deficiencies identified in this Opinion. Also, Plaintiff may renew his request to join Scentsational Technologies LLC and Steven M. Landau and file claims against them. The Clerk of the Court is respectfully requested to terminate the pending Motion (Dkt. No. 34).

SO ORDERED.

DATED:      March ____, 2015
            White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE